IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RYAN HODINKA, RICK LACEY, NANCY RICCA, and RUDY RICCA, Plaintiffs, | : : : : | CIVIL ACTION |
| v. | : : | NO. 08-5663 |
| DELAWARE COUNTY, a/k/a COUNTY OF DELAWARE, BOARD AND BUREAU OF ELECTIONS OF DELAWARE COUNTY, LAUREEN HAGAN, individually and in her official capacity as Chief Clerk of the Bureau of Elections of Delaware County, JOSEPH F. McGINN, individually and in his official capacity as SHERIFF OF DELAWARE COUNTY, and LT. DOMINIC SQUILLACE and SHERIFF'S DEPUTIES COLIN PATRICK, AL GOLDSTEIN, GREG PRICE, BARTON ROBINSON, TOM McAULIFFE, and KEVIN SCANLON, individually and in their official capacities, Defendants. | : : : : : : : : : : : : : : : : : | |

**DuBOIS, J.**                                              **January 7, 2011**

**M E M O R A N D U M**

I.    **INTRODUCTION**

This case arises out of an election that took place in Delaware County, Pennsylvania, in

April 2008.  Plaintiffs, candidates for various Republican Party positions in that election, assert

claims under 42 U.S.C. § 1983, alleging violations of their First and Fourth Amendment rights

based on defendants' confiscation of their campaign literature on Election Day.  This Court has

-1-

jurisdiction over plaintiffs' § 1983 claims pursuant to 28 U.S.C. § 1331. Presently before the

Court are the parties' cross-motions for summary judgment and responsive filings. For the

reasons set forth below, the Court denies plaintiffs' Motion for Summary Judgment, and grants

defendants' Motion for Summary Judgment in part and denies it in part.

## II.    BACKGROUND

The basic facts of this case are undisputed. In the April 2008 Republican Primary

Election, plaintiffs Ryan Hodinka and Ryan Lacey were running for election as delegates to the

2008 Republican National Convention, and plaintiffs Nancy Ricca and Rudy Ricca were running

for election as Republican Committee persons for the precinct covering Marple Township. (Pls.'

Statement of Material Facts ¶¶ 3-4, hereinafter "PSMF"; Defs.' Resp. to PSMF ¶¶ 3-4,

hereinafter "Defs.' Resp.") On April 21, 2008, the day before Primary Election Day, Hodinka

and Lacey were named as two of ten defendants in a law suit filed in the Delaware County Court

of Common Pleas (hereinafter "the Delaware County suit"). (PSMF ¶ 5; Defs.' Resp. ¶ 5.) The

Delaware County suit alleged that Hodinka, Lacey, and their eight co-defendants (collectively

"the Delaware County defendants") were distributing fraudulent campaign literature in violation

of Pennsylvania election law. (PSMF ¶ 5; Defs.' Resp. ¶ 5.) The Riccas were not named as

defendants in the Delaware County suit. (PSMF ¶ 6; Defs.' Resp. ¶ 6.)

The contested campaign literature pertained to the campaigns of Hodinka, Lacey, the

Riccas, and other related candidates. (PSMF ¶ 9; Defs.' Resp. ¶ 9.) The materials consisted of

single- and double-sided palm cards which included names, photographs, and/or the ballot

positions of the candidates. (PSMF ¶ 8-10; Defs.' Resp. ¶ 8-10.) The double-sided palm cards

contained information on a candidate for Republican National Convention delegate on one side,

and information on a like-minded candidate for a Republican Committee position on the reverse side, in precincts where both candidates were eligible. (PSMF ¶ 9; Defs.' Resp. ¶ 9.) Hodinka, Lacey, and the Riccas were variously named and described as candidates in the double-sided palm cards. (PSMF ¶ 9; Defs.' Resp. ¶ 9.) The Delaware County Complaint averred that the palm cards were fraudulent because the group of candidates portrayed in the contested campaign literature constituted a "political committee" under Pennsylvania Election Code, requiring certain disclosures pursuant to the law, which were not properly made by the Delaware County defendants. (Ex. A to Defs.' Mot. for Summ. J.; PSMF ¶ 14; Defs.' Resp. ¶ 14.)

Plaintiffs in the Delaware County suit obtained a hearing on their petition for a preliminary injunction on April 21, 2008, the same day the lawsuit was filed. (Defs.' Statement of Material Facts ¶ 4, hereinafter "DSMF"; Pls.' Resp. to DSMF ¶ 4, hereinafter "Pls.' Resp.") In that hearing, the plaintiffs sought emergency injunctive relief to preclude distribution of the allegedly fraudulent palm cards. (PSMF ¶ 11, Defs.' Resp. ¶ 11.) Hodinka, Lacey, and the other Delaware County defendants were not present or represented at the hearing. (Ex. B to Defs.' Mot. for Summ. J., April 21, 2008 Hr'g Tr., hereinafter "April 21 Hr'g Tr.") At the conclusion of the hearing, Judge Joseph P. Cronin issued an order enjoining "further distribution of the fraudulent campaign literature" and directing the Delaware County defendants to collect the literature and deliver it to the Delaware County Board of Elections prior to the time of the election on April 22, 2008. (April 21 Hr'g Tr. 20-23; Ex. C to Defs.' Mot. for Summ. J., April 21, 2008 Order, hereinafter "April 21, 2008, Order.")[1] The Order permitted the Delaware County defendants to file a petition to seek dissolution of the preliminary injunction at any time from

---

[1] The April 21, 2008, Order is attached to this Memorandum as Appendix 1.

12:45 p.m. on April 21, 2008 through 8:00 pm on April 22, 2008, Election Day. (Id.) The language of the Order did not expressly authorize the Board of Elections or its agents to seize any of the literature. (April 21, 2008, Order.)

On the evening of April 21, 2008, Lacey discovered that several copies of the Delaware County Complaint and the April 21, 2008, Order had been placed between the two exterior doors at his home. (Ex. G to Defs.' Mot. for Summ. J., Lacey Dep. 44-47.) The following morning at 7:00 a.m., Hodinka and Lacey went to the Delaware County Courthouse, where they moved to vacate the injunction. (PSMF ¶ 32; Defs.' Resp. ¶ 32.) Counsel for plaintiffs in the Delaware County suit was notified and also appeared in court that morning. (PSMF ¶ 33; Defs.' Resp. ¶ 33.) Judge Chad F. Kenney then conducted a hearing with respect to the petition to vacate. (PSMF ¶ 33; Defs.' Resp. ¶ 33.) After determining that the Pennsylvania Election Code provision upon which the court had previously relied in granting injunctive relief was not applicable to candidates for party office (as opposed to public office), Judge Kenney vacated the Preliminary Injunction Order of April 21, 2008, on the morning of April 22, 2008, the day of the Primary Election. (Ex. S to Defs.' Mot. for Summ. J., April 22, 2008 Hr'g Tr. 38-47, hereinafter "April 22 Hr'g Tr.")

However, before the April 21, 2008 Order was vacated, Sheriff's Deputies from the Delaware County Sheriff's Office, acting on instructions from Francis Catania, an Assistant Solicitor for Delaware County assigned to the Bureau of Elections,[2] confiscated campaign literature pertaining to the candidacies of the Delaware County Defendants and the Riccas.

---

[2] There is a question of material fact whether some of the deputy sheriffs executing seizures were also acting on orders of Sheriff's Lieutenant Dominic Squillace.

-4-

(PSMF ¶ 35, Defs.' Resp. ¶ 35.) After the order was vacated, the literature was returned to the places from which it was taken or to a representative of the plaintiffs. (DSMF ¶¶ 37-39, Pls.' Resp. ¶¶ 37-39.)

The Board of Elections is governed by the Pennsylvania Election Code and establishes policies for the Bureau of Elections. (PSMF ¶¶ 52-53, Defs.' Resp. ¶¶ 52-53.) The Bureau of Elections is the administrative arm of the Board and is responsible for planning and overseeing elections in Delaware County. Id. Francis Catania, as an Assistant Solicitor for Delaware County, was assigned primarily to the Bureau of Elections, and handled legal matters for the Bureau. (PSMF ¶ 51, Defs.' Resp. ¶ 51.) The Delaware County Sheriff's Office provided volunteer deputies to work on behalf of the Bureau of Elections on Election Day to assist the Bureau in conducting and monitoring the elections. (PSMF ¶ 54, Defs.' Resp. ¶ 54.) Lieutenant Dominic Squillace of the Sheriff's Office coordinated the volunteer Deputies on Election Day. (PSMF ¶ 55(b), Defs. Resp. ¶ 55(b).) Either Squillace, Catania, or both communicated orders to deputies working on behalf of the Bureau of Elections on Election Day. (PSMF ¶ 35, Defs.' Resp. ¶ 35.)

It is undisputed that sheriff's deputies effected the following seizures of campaign literature on Election Day:

    (1)    Deputy Sheriff Colin Patrick confiscated palm cards relating to the candidacies of Hodinka and Lacey from David Savastio at the Saxer Avenue polling location. (Ex. L to Defs.' Mot. for Summ. J., Patrick Dep. 23-26, hereinafter "Patrick Dep."; Ex. V to Defs.' Mot. for Summ. J., Savastio Dep. 19-22, hereinafter "Savastio Dep."; Ex. E to Defs.' Mot. for Summ. J.) Hodinka had given Savastio

the palm cards to distribute. (Savastio Dep. 15-16.) Deputy Sheriff Al Goldstein was also present at the Saxer Avenue location for the purpose of confiscating campaign literature, but did not personally participate in the seizure of any materials from Savastio (Ex. CC to Pls.' Mot. for Summ. J., Goldstein Dep. 9-11, hereinafter "Goldstein Dep.");

(2)  Plaintiffs Nancy and Rudy Ricca were present at the Paxon Hollow Middle School polling location, distributing personal letters of introduction and double-sided palm cards. (PSMF ¶¶ 41-42; Defs.' Resp. ¶¶ 41-42; Ex. O to Defs. Mot. for Summ. J., R. Ricca Dep. 15-19.) The palm cards contained the names and photographs of plaintiffs Hodinka and Lacey and other candidates seeking election as delegates to the Republican National Convention on one side and the Riccas' names and photographs on the opposite side. (PSMF ¶ 41; Defs.' Resp. ¶ 41.) Deputy Sheriffs Greg Price and Barton Robinson, working on behalf of the Bureau of Elections, were dispatched to the Paxon Hollow polling location. (DSMF ¶ 25; Pls.' Resp. ¶ 25.) After receiving instructions from Catania, Price and Robinson confiscated a number of double-sided palm cards and at least one self-prepared letter of introduction from the Riccas.[3] (Ex. K to Defs.' Mot. for Summ. J., Robinson Dep. 13-14, 16-18, hereinafter "Robinson Dep."; Ex. J to

---

[3] Rudy Ricca and Nancy Ricca offer conflicting accounts of the number of letters of introduction seized by the Deputy Sheriffs. Mr. Ricca testified that the Deputies took a box full of the letters (R. Ricca Dep. 27-28), while Mrs. Ricca testified that the Deputies left the box of letters with the Riccas. (Ex. N to Defs.' Mot. for Summ. J., N. Ricca Dep. 44-45.) However, both Mr. and Mrs. Ricca testified that Price took at least one letter.

Defs.' Mot. for Summ. J., Price Dep. 15, hereinafter "Price Dep."; PSMF ¶¶ 41, 43; Defs.' Resp. ¶¶ 41, 43.)

(3)     After leaving the Paxon Hollow Middle School, Deputies Price and Robinson went to the Russell School polling location. (DSMF ¶ 30; Pls.' Resp. ¶ 30.) There, Price and Robinson confiscated double-sided palm cards pertaining to plaintiffs Hodinka and Lacey and other candidates, from Stephen and Joanne Schork and Phillip Hemmingway. (PSMF ¶ 49; Defs.' Resp. ¶ 49; DSMF ¶ 31-33; Pls.' Resp. ¶ 31-33.)

(4)     Deputy Sheriff Kevin Scanlon and his partner, Deputy Sheriff Tom McAuliffe, were dispatched to the Mason Hall polling location in Marple Township, where they confiscated additional campaign literature described in the Injunction Order. (Ex. I to Defs.' Mot. for Summ. J., Scanlon Dep. 11; Ex. M to Defs.' Mot. for Summ. J., McAuliffe Dep. 31, hereinafter "McAuliffe Dep.")

## III.     STANDARD OF REVIEW

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

## IV.    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The threshold question relating to plaintiffs' summary judgment motion is whether either a permanent injunction or declaratory judgment is an appropriate remedy. Plaintiffs only seek summary judgment on their declaratory judgment and permanent injunction claims and not on their claims for monetary damages. For the reasons set forth below, neither remedy is appropriate in this case, and plaintiffs' Motion for Summary Judgment is denied.

### A.    Declaratory Judgment

#### 1.    *Legal Standard*

The Declaratory Judgment Act provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. "Whether declaratory relief should be granted in an appropriate case is committed to the sound discretion of the trial court." Berger v. Weinstein, No. 07-994, 2008 WL 3984164, at *3 (E.D. Pa. Aug. 26, 2008) (quoting Main Line Paving Co. v. Bd. of Educ., Sch. Dist. of Philadelphia, 725 F. Supp. 1349, 1357 (E.D. Pa. 1989)); see also Wilton v. Seven Falls Co., 515 U.S. 277, 288 (1995) ("[A]

district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial . . . . In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."); State Auto Ins. Cos. v. Summy, 234 F.3d 131, 133 (3d Cir. 2000).

The Third Circuit has set out the following general guidelines for the exercise of discretion under the Declaratory Judgment Act: "(1) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies." Terra Nova Ins. Co. v. 900 Bar, Inc., 887 F.2d 1213, 1224 (3d Cir. 1989); United States v. Pennsylvania, Dep't of Envtl. Resources, 923 F.2d 1071, 1075 (3d Cir. 1991).

More generally, "[d]eclaratory judgment is inappropriate solely to adjudicate past conduct . . . [n]or is declaratory judgment meant simply to proclaim that one party is liable to another." Corliss v. O'Brien, 200 F. App'x 80, 84 (3d Cir. 2006) (upholding dismissal of plaintiff's declaratory relief claim, which asked that the District Court "declare that his constitutional rights were violated"). In Gruntal & Co., Inc. v. Steinberg, the court explained:

> The real value of the judicial pronouncement – what makes it a proper judicial resolution of a "case or controversy" rather than an advisory opinion – is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff . . . . If the declaratory judgment is sought to protect against a feared, future event, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

837 F. Supp. 85, 89 (D.N.J. 1993) (internal citations omitted).

In Golden v. Zwickler, the Supreme Court addressed a situation with parallels to this case. 394 U.S. 103 (1969). Plaintiff brought suit to challenge the constitutionality of a state statute that prohibited the distribution of anonymous literature in connection with an election campaign. He had once been convicted of violating the statute for distributing handbills opposing the reelection of a congressman, but his conviction had been reversed on state law grounds. Id. at 104-05. He alleged that the congressman would be running again for reelection, and that he wished to be free to hand out anonymous literature in opposition to that campaign. Id. at 105-06. The Supreme Court held that declaratory relief was inappropriate, since the plaintiff's contention that the situation would occur again was purely conjectural – the congressman in question had left Congress and had taken a fourteen-year term as a state judge. Id. at 109. Accordingly, the Supreme Court reversed the district court and remanded with direction to dismiss the complaint. Id. at 110.

>    2.    *Analysis*

Declaratory judgment is not available as a remedy to plaintiffs under the facts of this case. Plaintiffs rest much of their argument for injunctive and declaratory relief on the testimony of Francis Catania, an Assistant Solicitor for Delaware County. who handled legal matters for the Bureau of Elections. In his deposition, Catania testified that the "seizure of campaign literature . . . in elections in Delaware County" may not "happen[ ] in every election" but that such an action is "not rare." (Ex. D to Defs.' Mot. for Summ. J., Catania Dep. 50, hereinafter "Catania Dep.") However, there is no evidence in the record that any other seizures were constitutionally improper, and Catania's statement alone is insufficient to show that the likelihood of a future

improper seizure of these plaintiffs' campaign materials is "real and substantial." Moreover, the fact that the defendant sheriffs take the position they were acting on the basis of a particular court order makes it extremely unlikely that the situation faced by plaintiffs in this case will ever repeat itself. See Golden v. Zwickler, 394 U.S. at 109. What remains then, are plaintiffs' claims regarding defendants' past conduct, which are not appropriately adjudicated by declaratory judgment.

B.    Permanent Injunction

1.    Legal Standard

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); see also Monsanto Co. v. Geertson Seed Farms, __ U.S. __, 130 S. Ct. 2743, 2756 (2010).[4] The decision to grant or deny the motion lies

---

[4] These Supreme Court cases resolved a dispute in Third Circuit case law regarding whether evidence of irreparable harm is necessary for a court to grant a permanent injunction, making it clear that a showing of irreparable harm is required. Compare Chao v. Rothermel, 327 F.3d 223, 228 (3d Cir. 2003) (stating that a permanent injunction may be granted "where the moving party has demonstrated that: (1) the exercise of jurisdiction is appropriate; (2) the moving party has actually succeeded on the merits of its claim; and (3) the 'balance of equities' favors granting injunctive relief"), with Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001) (stating that a court may grant a permanent injunction if it finds, inter alia, that "the moving party will be irreparably injured by the denial of injunctive relief") (citing ACLU v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 nn. 2-3 (3d Cir. 1996)).

within "the sound discretion of the district judge, who must balance all of these factors in making a decision." Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982). Injunctive relief is an "extraordinary remedy" that should be "granted only in limited circumstances." Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988).

        2.    *Analysis*

Plaintiffs' request for a permanent injunction fails for the same reasons their declaratory judgment request fails. Plaintiffs' reference to Catania's single statement that confiscation of campaign materials is "not rare" does not demonstrate the likelihood of the sort of ongoing, irreparable injury that permanent injunctions are meant to cure. Again, the fact that the actions of the deputy sheriffs were allegedly taken pursuant to a court order makes it highly unlikely that the events at issue in this case will be repeated. Moreover, plaintiffs have not alleged that they intend to run for office in the future, or that they themselves are likely to be subjected again to confiscation of campaign literature by defendants. Accordingly, plaintiffs' request for a permanent injunction is denied.

## V.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' Motion for Summary Judgment argues that: (1) there was no First or Fourth Amendment violation, (2) plaintiffs present insufficient evidence to support a Monell claim against Delaware County, (3) plaintiffs present no evidence to support a claim against Sheriff McGinn or Chief Clerk Laureen Hagan, and (4) defendants are entitled to qualified immunity. The Court addresses each argument in turn.

A.    First and Fourth Amendment Violations

    1.    *Legal Standard*

It is beyond dispute that the First and Forth Amendments protect against the seizure of campaign literature. The Supreme Court has continuously emphasized the importance of free speech in the context of campaign literature and subjected government attempts to regulate it to exacting scrutiny. See, e.g., McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346 (1995) (political speech "occupies the core of the protection afforded by the First Amendment"); Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971) (The First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office.").

The Supreme Court has also articulated a Fourth Amendment doctrine that protects property as well as privacy. See, e.g., Soldal v. Cook County, 506 U.S. 56 (1992); United States v. Place, 462 U.S. 696, 701 (1983) ("In the ordinary case . . . a seizure of personal property [is] per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.") (1983). Under this doctrine a "seizure" of property occurs whenever "there is some meaningful interference with an individual's possessory interests in that property." Soldal, 506 U.S. at 63. Even a relatively brief interference with property can qualify as a seizure for Fourth Amendment purposes. See, e.g., Audio Odyssey v. Hofmann, 245 F.3d 721, 736 (8th Cir. 2001). The parties do not dispute in the briefs that the confiscation of literature at issue in this case would qualify as a seizure under the Fourth Amendment if it lacks legal justification.

    2.    *Application*

In contending that there were no First or Fourth Amendment violations, defendants make

two arguments. First, they contend that plaintiffs had no right to possess or distribute the literature because it was fraudulent. Second, they argue that the April 21, 2008, Order authorized the Bureau of Elections to seize the literature.   Both arguments are rejected.

> a. Defendants' First Argument: Plaintiffs Had No Right to Possess or
> Distribute "Fraudulent" Literature

Defendants' first argument – that plaintiffs had no right to possess or distribute fraudulent literature – is only a defense to the alleged First Amendment violation. The Supreme Court has acknowledged that state and local governments have valid interests in preventing the dissemination of dishonest or misleading campaign literature and may impose narrowly tailored laws regulating the same. See McIntyre, 514 U.S. at 349; Storer v. Brown, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."). However, defendants do not contend that this interest in regulating campaign speech by itself creates any exception to the Fourth Amendment prohibition against unreasonable seizures.

Moreover, even as a defense to the alleged First Amendment violation, defendants' argument is entirely reliant on the proposition that the April 21, 2008, Order somehow declared the palm cards to be fraudulent. Although the order refers to the palm cards as "the fraudulent literature," that part of the order was drafted by counsel for the Delaware County Plaintiffs and is not a ruling on the merits. Plaintiffs are correct that the emergency order did not constitute a determination that the literature was fraudulent. See, e.g., 11A Charles Alan Wright, Arthur R. Miller & Marry Kay Kane, Federal Practice and Procedure § 2950 (2d ed. 1995) ("Based as they

-14-

usually are, on incomplete evidence and a relatively hurried consideration of the issues, these provisional decisions [from a preliminary injunction hearing] should not be used outside the context in which they originally were rendered.").

### b. Defendants' Second Argument: The Seizures Were Authorized by the April 21, 2008, Order

Defendants' second argument is that, while the court order did not explicitly assign any active role to the Board of Elections, when combined with the Board of Elections' statutory mandate to run fair elections, it implicitly authorized them to seize the literature. The Court disagrees. The order does not authorize seizure of the literature by anyone. To the contrary, the language of the order is couched entirely in terms of the Delaware County defendants' responsibilities:

> Defendants are enjoined against further distribution of the fraudulent campaign literature . . . and required to personally go to each location at which copies of the fraudulent campaign literature may exist . . . to take personal custody of all such copies . . . and deliver those copies to the Delaware County Board of Election.

(April 21, 2008, Order at 2.)

The defendants in this case construe the order's requirement that the literature be turned over to the Election Board as indicating the Delaware County Court of Common Pleas' intent that the Election Board have possession of the documents: "The Order thus implies that where plaintiffs failed to turn documents over, the Election Board had the power to collect the documents to assure a fair and proper election." (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. at 11.)

On its face, any argument about an implied permission to seize property runs afoul of

the Fourth Amendment's detailed requirements for the issuance of a warrant. Defendants cite no precedent for the proposition that an alleged implicit seizure authorization in an injunction order can survive Fourth Amendment scrutiny. On the contrary, the Third Circuit and other federal courts have held that police officers cannot infer authorization for searches or seizures without violating the Fourth Amendment. See, e.g., Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 192-93 (3d Cir. 2005) (affirming district court's finding that police officer violated the Fourth Amendment when he incorrectly inferred authorization based on, inter alia, a court order and entered a person's home); Audio Odyssey v. Brenton First Nat'l Bank, 245 F.3d 721, 736 (8th Cir. 2001) (finding a Fourth Amendment violation where police officers misconstrued a writ and order authorizing seizure of certain personal property from a store as permitting them to change the locks and seize the entire store). In light of this precedent, the Court rejects defendants' arguments about implied authorization to seize campaign literature.

Similarly, the plain language of the April 21, 2008, Order and basic First Amendment principles lead the Court to reject defendants' argument that the order implicitly authorized the physical seizure of the campaign literature. Even assuming that the April 21, 2008, Order was constitutional as written, defendant sheriffs' actions places them outside its scope. The Court finds the initial order unambiguous in that it did not authorize physical seizures of campaign literature by defendant sheriffs. Because their actions were not within the scope of the order, defendant sheriffs cannot use the order to argue that they did not infringe plaintiffs' First Amendment rights.

Significantly, the April 21, 2008, Order afforded the Delaware County defendants procedural protections in the form of an opportunity to contest the order the following morning –

-16-

which they successfully did prior to complying with it – and, necessarily, the opportunity to present procedural or substantive defenses that would have been available to them in a contempt hearing. On this issue, plaintiffs in this case aver that even if the Delaware County plaintiffs had sought contempt sanctions on the basis of the order, the Delaware County defendants had grounds to contest the efficacy of the order. (Pls.' Mem. of Law in Opp'n at 11-13.) For example, they argue that the order never went into effect for lack of a bond. (Id. at 11.)

Without determining whether those defenses would have prevailed, the Court notes that by physically seizing the campaign literature, defendant sheriffs substituted their judgment as to whether the order had been violated for that of the Court of Common Pleas. Defendant sheriffs thus deprived plaintiffs of their First Amendment rights without affording them the procedural protections that the April 21, 2008, Order left in place. Judicially imposed prior restraints on First Amendment rights should be narrowly drawn and construed. See Tory v. Cochran, 544 U.S. 734, 738 (2005) (describing requirement that orders affecting First Amendment rights be narrowly tailored and specific); Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 303 n.12 (1986) ("[F]irst amendment rights are fragile and can be destroyed by insensitive procedures.") (quoting Henry Monaghan, First Amendment "Due Process", 83 Harv. L. Rev. 518, 551 (1970)). Because the Court concludes that the order unambiguously did not authorize seizures, defendants placed themselves outside of the scope of the order and cannot rely on it to argue that they did not violate plaintiffs' First Amendment rights.

B.     Municipal Liability Under 42 U.S.C. § 1983

Defendants contend that plaintiffs present insufficient evidence to support a claim against Delaware County or the Board and Bureau of Elections under 42 U.S.C. § 1983.

Municipalities cannot be held liable under 42 U.S.C. § 1983 under a theory of vicarious

liability. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Rather, municipal liability

under § 1983 is limited to those circumstances in which the "execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury." Id. Following subsequent elaboration from the

Supreme Court, the Third Circuit has outlined three circumstances in which municipal liability

will attach under § 1983:

> First, the municipality will be liable if its employee acted pursuant to a
> formal government policy or a standard operating procedure long accepted
> within the government entity; second, liability will attach when the
> individual has policy making authority rendering his or her behavior an act
> of official government policy; third, the municipality will be liable if an
> official with authority has ratified the unconstitutional actions of a
> subordinate, rendering such behavior official for liability purposes.

McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005) (internal citations omitted).

In this case, plaintiff makes arguments under the first and second circumstances identified

by the Third Circuit's test.

1.    *Plaintiffs' Argument Based on Policy or Custom*

a.    Legal Standard

Under the first circumstance identified by the Third Circuit, the key to municipal liability

is establishing the existence of a policy or custom. The Third Circuit has defined policy as

follows: "Policy is made when a 'decisionmaker possess[ing] final authority to establish

municipal policy with respect to the action' issues an official proclamation, policy, or edict."

Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City

of Cincinnati, 475 U.S. 469 481 (1986)). By contrast, custom "can be proven by showing that a

-18-

given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Notably, custom does not require any affirmative declaration but may be proved instead by evidence of knowledge and acquiescence in a longstanding practice. Jett v. Dallas Independent School Dist., 491 U.S. 701, 737 (1989); Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989), cert. denied, 492 U.S. 919 (1989).

In addition to identifying a policy or custom, a plaintiff bears the burden of proving that the municipal practice in question was the proximate cause of the violation of his constitutional rights. Bielevicz, 915 F.2d at 850. "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue . . . . As long as the causal link is not too tenuous, the question of whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." Id. (internal citations omitted); see also Bd. of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (U.S. 1997) ("The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.").

> b.  Analysis of Plaintiffs' Argument Based on Policy or Custom

When measured against the above-described law, plaintiffs' arguments based on county policy or custom fail. Plaintiffs' primary argument for Monell liability is based on the "longstanding County policy of using deputy sheriffs to carry out directives of the Board and

-19-

Bureau of Elections at polling places." (Pls.' Mem. of Law in Opp'n at 22.) Here again, plaintiffs quote the testimony of Assistant Soliciter Catania that seizures of campaign literature are a "not rare" event on election day. (Catania Dep. 50.) Even assuming that sheriff's deputies were involved in other seizures, however, plaintiffs aver no evidence that any other election-day seizures were constitutionally improper.

Moreover, plaintiffs present no evidence demonstrating that the policy of using deputy sheriffs was a proximate cause of their injuries. While the policy or custom complained of need not be unconstitutional in itself, it still must be the "moving force" behind the constitutional violation. Colburn v.Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991). Indeed, plaintiffs' argument is not dissimilar from the contention that the policy of maintaining a police force is a proximate cause of all Fourth Amendment violations. This sort of attenuated causation logic would deprive Monell of any significance as a bar to municipal liability. While proximate causation is usually a question of fact for a jury, Bielevicz 915 F.2d at 850, plaintiffs' argument on causation is so tenuous that it presents no triable issue of material fact.

2.    *Plaintiffs' Argument Based on Policy-Making Authority*

a.    Legal Standard

Plaintiffs attempt to reinforce their argument about the use of deputy sheriffs by arguing that Catania issued a seizure order and that this order constituted an official policy because of Catania's status. Under the second part of the Third Circuit's test – i.e., where the official in question has policy-making authority rendering his behavior an act of official government policy – there are two inquiries. First, a court must inquire whether as a matter of state law the official in question has authority to set policy in that particular area of municipal business. Hill v.

-20-

Borough of Kutztown, 455 F.3d 225, 245 (3d Cir. 2006). This normally involves looking at the specific statutory delegation of authority to the particular official position. See, e.g., McGreevy v. Stroup, 413 F.3d 359, 368-69 (3d Cir. 2005). Second, a court must determine "whether the official's authority to make policy in that area is final and unreviewable." 455 F.3d at 245 (3d Cir. 2006) (emphasis in original) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988)). This second inquiry frequently involves looking to see whether any other official has supervisory authority over the specific action of the official in question. See, e.g., id. at 246 (holding that, while town counsel had final supervisory authority over the hiring and firing of employees in plaintiff's position, it did not have supervisory authority over the mayor's constructive discharge of plaintiff).

b.    Analysis

Whether Catania issued an explicit order to seize the literature is, at this point, a disputed issue. See infra Section V.D. However, for the purpose of evaluating Monell liability the exact contents of Catania's instructions are immaterial because the Court concludes that Catania was not a final policy-maker under state law with respect to the matters at issue in this case.

Plaintiffs present no evidence that Catania, an assistant county solicitor, had authority to set county policy such that his order to seize literature could rise to the level of an official policy. As noted above, the issue of whether an official is a final policy-maker under state law is normally determined on the basis of state statutory delegations of authority. See, e.g., McGreevy, 413 F.3d at 368-69. Plaintiffs do not contend that Catania's position had any specific statutory delegations of authority, much less final and unreviewable authority. Catania's own testimony confirms that he did not possess final and unreviewable authority. He testified that he was

employed by the Bureau of Elections, which is merely the administrative arm of the Board of Elections, and that the Board of Elections actually sets policy. (Catania Dep. 9-10, PSMF ¶¶ 52-53, Defs.' Resp. ¶¶ 52-53.) Decisions made by Catania as a solicitor for the Bureau of Elections are subject to review by the Board of Elections.

As with plaintiffs' argument concerning the use of deputy sheriffs, accepting plaintiffs' contention that Cantania's order was a policy would defeat the underlying logic of <u>Monell</u> – that municipalities should not be liable under respondeat superior. The Court thus rejects both arguments and grants summary judgment in favor of Delaware County, the Board of Elections of Delaware County, and the Bureau of Elections of Delaware County.

C.    <u>Plaintiffs' Claims Against Sheriff McGinn and Laureen Hagan</u>

Plaintiffs have not presented sufficient evidence to support a claim against Sheriff McGinn or Laureen Hagan, the Chief Clerk of the Bureau of Elections.

There is no direct evidence that Sheriff McGinn was aware that his deputies were working for the Bureau of Elections on Election Day, although Deputy Sheriff McAuliffe testified that he "would believe" that McGinn was aware they worked on election day. (McAuliffe Dep. at 20.) McGinn himself was not deposed. The Court concludes, however, that resolution of this question is unnecessary because plaintiffs have adduced no evidence that Sheriff McGinn was present at, or involved in, the specific activities complained about in this case. Plaintiffs argue only that Sheriff McGinn is liable under 42 U.S.C. § 1983 based on his acquiescence in the custom of permitting his deputies to work for the Bureau and Board of Elections on Election Day. (Pls.' Resp. to Defs.' Mot. to Dismiss at 24.) However, an argument based exclusively on the use of sheriff's deputies on Election Day must fail because, as set forth

-22-

above,[5] use of sheriff's deputies on Election Day was not the proximate cause of any injury.

Laureen Hagan is the Chief Clerk of the Bureau of Elections. At the April 21, 2008, hearing she testified about filings made by Delaware County Defendants with the Bureau of Elections. (DSMF ¶ 5, Pls.' Resp. ¶ 5.) However, plaintiffs have not pointed to any evidence connecting Hagan with the seizures of campaign literature, which are the specific activities alleged to be unconstitutional. Hagan testified that her duties on election day were administrative in nature and included such things as resolving problems with voting machines. (Ex. H to Defs.' Mot. for Summ. J., Hagan Dep. 10.) Specifically, she stated she did not handle legal or conduct-related matters and that she had no contact with the deputy sheriffs concerning the April 21m 2008, Order. (Id. at 9-10.) Thus, plaintiffs' claims against Hagan have no support in the record.

In light of the foregoing, the Court grants defendants' motion for summary judgment as to defendants Sheriff McGinn and Laureen Hagan.

### D.    Qualified Immunity

The claims against Sheriff Joseph McGinn, Bureau of Elections Chief Clerk Laureen Hagan, Delaware County, and the Board and Bureau of Elections of Delaware County must be dismissed. The only remaining defendants are Lieutenant Dominic Squillace and the six deputy sheriffs who participated in seizures of campaign literature. These defendants contend that they are entitled to qualified immunity.

### 1.    *Legal Standard*

The doctrine of qualified immunity provides that government officials are immune from suits for civil damages under 42 U.S.C. § 1983 "insofar as their conduct does not violate clearly

---

[5] See supra Section V(B)(1).

established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Because it attempts to protect innocent officials from litigation while allowing liability for those who abuse their discretion, qualified immunity represents an "accommodation of competing values." Id. at 814. In light of the competing values at stake, the Supreme Court and the Third Circuit have emphasized that the qualified immunity analysis is specific to each individual defendant and takes into account the totality of the circumstances as it appeared to each individual defendant at the time of his challenged conduct. Maryland v. Garrison, 480 U.S. 79, 85 (1987) (noting that the constitutionality of officers' conduct must be evaluated "in light of the information available to them at the time they acted"); Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007).

The availability of qualified immunity is a question of law to be decided by the court. Curley, 499 F.3d at 211. Determining whether a defendant is entitled to qualified immunity requires two inquiries, which can be taken in either order. Pearson v. Callahan, 555 U.S. __, 129 S. Ct. 808, 818 (2009). The first is "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." Id. at 816 (internal citations omitted). The second is "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Reedy v. Evanson, 615 F.3d 197, 224 (3d Cir. 2010) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Pearson, 129 S. Ct. at 822 (internal quotation marks omitted).

The objective reasonableness test for qualified immunity requires consideration of "the information within the officer's possession at that time." Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 194 (3d Cir. 2005) (citing Anderson v. Creighton, 483 U.S. 635 (1987)). Orders or advice from superiors are not sufficient, standing alone, to confer qualified immunity where an officer should know that his actions are illegal. See, e.g., Diamondstone v. Macaluso, 148 F.3d 113, 126 (2d Cir. 1998). However, "[p]lausible instructions from a superior or fellow officer can support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." Harvey, 421 F.3d at 199 (Becker, J., dissenting) (internal quotation marks omitted) (quoting Bilida v. McCleod, 211 F.3d 166, 174-75 (1st Cir. 2000)); Audio Odyssey v. Hofmann, 245 F.3d 721, 737-38 (8th Cir. 2001) (discussing reliance on legal advice as part of reasonableness analysis).

2.     *Analysis*

It is impossible on the present record to determine whether Lieutenant Squillace and the deputy sheriffs are entitled to qualified immunity. Specifically, there are genuine issues of material fact as to the conduct of, and the circumstances confronting, Lieutenant Squillace and the deputy sheriffs. For example, the exact content of Catania's instructions to the deputies is in dispute. While several deputies testified that they were specifically instructed to seize the campaign literature (see Price Dep. 16; Patrick Dep. 24; McAuliffe Dep. 41; Robinson Dep. 17), Catania maintains that he never used the word "seize" and merely instructed the deputies to prevent further distribution of the literature. (Catania Dep. 88, 98-99, 102.) Indeed, not only the content, but also the circumstances of Catania's order to the deputies are in dispute. Four of the

six deputy sheriffs claim that they received an oral instruction via cellular phone and did not have an opportunity to inspect the written court order before they effectuated the seizures. (Goldstein Dep. 9-10; Patrick Dep. 24-25; Price Dep. 15-16; Robinson Dep. 17-18.) Catania's testimony, on the other hand, states that all of the deputies were sent out with written copies of the order. (Catania Dep. 40.) Also still to be determined are what, if any, instructions were issued by Lieutenant Squillace. While Squillace testified that he did not give any orders to the deputy sheriffs once they were in the field (Ex. AA to Defs.' Mot. for Summ. J., Squillace Dep. 42), McAuliffe testified that his instructions came from Squillace. (McAuliffe Dep. 33.) Because legal advice and instructions from superiors are relevant considerations in evaluating the totality of circumstances presented to each individual defendant, these are genuine issues of material fact that must be determined by a jury before the Court can determine whether defendants are entitled to qualified immunity.

For the foregoing reasons, defendants' Motion for Summary Judgment is denied as to Lieutenant Dominic Squillace and deputy sheriffs Patrick, Goldstein, Price, Robinson, McAuliffe, and Scanlon.

## VI.    CONCLUSION

Defendants' Motion for Summary Judgment is granted as to Delaware County, the Board of Elections of Delaware County, the Bureau of Elections of Delaware County, Laureen Hagan, and Joseph F. McGinn and denied as to the remaining defendants. Plaintiffs' Motion for Summary Judgment is denied.

An appropriate order follows.

**Appendix 1**

**April 21, 2008, Order**

ɔl, Byrne & Matlawski, P.C.                    BY:    JAMES J. BYRNE, JR., ESQUIRE
Baltimore Pike                                         Attorney I.D. No. 41619
., PA 19063
ɟ 565-4322

THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

Barbara Harvey                          :
447 Warren Blvd.                        :
Broomall, PA 19009                      :
                                        :
                                        :
And                                     :                  No. 08 - 4688
                                        :
Alan                                    :
627                                     :
Sprin                                   :
                                        :
                                        :
                                        :
                                        :
                                        :
Rick Lacey                              :
116 Overhill Road                       :
Springfield, PA 19064;                  :
                                        :
David K. Walter,                        :
Michael P. Boyle,                       :
Peter J. Manfra                         :
Ryan Hodinka,                           :
John Savastio,                          :
John Pedley,                            :
Bernie Strain,                          :
Mike Noonan, and                        :
Marianne Loughran                       :
                  Defendants            :


## ORDER GRANTING EMERGENCY EQUITABLE RELIEF

AND NOW, to wit, this _____ day of _____, 2008, at _____ .M., upon

consideration of the verified Complaint in Equity (Election Controversy) and after notice to the

3

_nts, and after hearing, the Court determines that Plaintiffs Barbara Harvey and Alana

_no are entitled to relief as prayed for in the Complaint  and it is accordingly

<u>**ORDERED**</u>    *08- 4688* ✓

_at Defendants are enjoined against further distribution of the fraudulent campaign literature, a

copy of which is attached as Exhibit "A" to the Complaint, and Defendants are required to

personally go to each location at which copies of the fraudulent campaign literature may now

exist, including specifically each polling place within Delaware County, to take personal custody

*DELAWARE COUNTY*

of all such copies of the fraudulent campaign literature and deliver those copies to the ~~Judge~~

*BOARD OF ELECTION*

~~presiding~~, prior to the time of the Primary Election on April 22, 2008, and it is further required,

*DELAWARE COUNTY*

that at the time of such delivery, Defendants shall make an oral report, on oath, to the ~~Judge of~~

*BOARD OF ELECTION*

~~the this Honorable Court~~, such report to verify that Defendants have taken all reasonable steps to

recover and deliver into the custody of the Court all copies of the fraudulent campaign literature

which can be found by him within Delaware County.

*The Defendants may file a petition to seek a dissolution of the preliminary injunctive relief granted herewith at any time from 12:45 P.M. 4/21/08 through 8:00 P.M. 4/22/08.*

BY THE COURT:

*Joseph _____ Jr.*

4

2008 APR 21 PM 1:5_
JUDICIAL SU___
OFFICE ___
DELAWARE CO. PA
FILED